UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | | |
|---|---|---|
| _____ | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  1:15-cv-455 |
| | ) | |
| MERIT ENERGY COMPANY, LLC | ) | HONORABLE PAUL L. MALONEY |
| | ) | |
| Defendant. | ) | |
| | ) | |
| _____ | ) | |

**CONSENT DECREE**

## TABLE OF CONTENTS

I.      JURISDICTION AND VENUE . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     APPLICABILITY . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    DEFINITIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.     CIVIL PENALTY . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

V.      COMPLIANCE REQUIREMENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        A.   Applicability of the Enhanced LDAR Program  . . . .. . . . . . . . . . . . . . 12
        B.   Facility-Wide LDAR Document . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
        C.   Monitoring Frequency and Equipment . . . . . . . . . . . . . .. . . . . . . . . . . 13
        D.   Leak Detection and Repair Action Levels . . . . . . . . . . . . . . . . . . . . . . 16
        E.   Repairs  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        F.   Delay of Repair . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
        G.   Valve Replacement and Improvement Program . . . . . . . . . . . . . . . . . . 20
        H.   Management of Change . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25
        I.   Training . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
        J.   Quality Assurance ("QA")/Quality Control ("QC") . . . . . . . . . . . . . . . 27
        K.   LDAR Audits and Corrective Action  . . . . . . . . . . . . . . . . . . . . . . . . . 28
        L.   Certification of Compliance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
        M.   Recordkeeping and Reporting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

VI.     NOTICES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

VII.    STIPULATED PENALTIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

VIII.   FORCE MAJEURE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

IX.     DISPUTE RESOLUTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

X.      INFORMATION COLLECTION AND RETENTION  . . . . . . . . . . . . . . . . . . . . 53

XI.     EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS  . . . . . . . . . . . . . . . . 54

XII.    COSTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

XIII.   EFFECTIVE DATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

XIV.    RETENTION OF JURISDICTION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

i

XV.     MODIFICATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

XVI.    TERMINATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

XVII.   PUBLIC PARTICIPATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

XVIII.  SIGNATORIES/SERVICE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

XIX.    INTEGRATION  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

XX.     FINAL JUDGMENT  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

## **<u>APPENDICES</u>**

Appendix A           Factors to be Considered and Procedures to be Followed to Claim
                     Commercial Unavailability

## CONSENT DECREE

WHEREAS, Plaintiff the United States of America ("United States"), on behalf of the United States Environmental Protection Agency ("EPA"), has filed a complaint against Merit Energy Company, LLC ("Merit," or the "Defendant") concurrently with the lodging of this Consent Decree;

WHEREAS Merit owns and operates a natural gas processing plant located at 1080 Prough Road SW, Kalkaska, Michigan (the "Facility");

WHEREAS, the Complaint alleges that Defendant violated Section 111 of the Clean Air Act ("CAA"), 42 U.S.C. § 7411, Title V of the CAA, 42 U.S.C. § 7661-7661(f) and the following implementing regulations: 40 C.F.R. Part 60, Subpart KKK (National Emission Standards of Performance for Equipment Leaks of VOC from Onshore Natural Gas Processing Plants) and, by reference, certain provisions of 40 C.F.R. Part 60, Subpart VV, and 40 C.F.R. Part 60, Appendix A, Method 21;

WHEREAS, Merit does not admit any liability to the United States arising out of the transactions or occurrences alleged in the Complaint and nothing in the Complaint, nor in this Consent Decree, nor in the execution and implementation of this Consent Decree shall be treated as an admission of any violation of federal or state statutes or regulations in any litigation or forum whatsoever, except that the terms of this Consent Decree, and Merit's failure to comply with the terms and conditions thereof, may be used by the United States in any action or dispute resolution proceeding to enforce the terms of this Consent Decree or as otherwise permitted by law;

1

WHEREAS, the United States and Merit recognize and this Court by entering this Consent Decree finds, that this Consent Decree has been negotiated by the Parties in good faith and will avoid litigation between the Parties, and that this Consent Decree is fair, reasonable, and in the public interest;

NOW, THEREFORE, before the taking of any testimony, without the adjudication or admission of any issue of fact or law except as provided in Section I, and with the consent of the Parties, IT IS HEREBY ADJUDGED, ORDERED, AND DECREED as follows:

## I.  JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1345, and 1355; and Section 113(b) of the CAA, 42 U.S.C. § 7413(b); and over the Parties.  Venue lies in this District pursuant to Section 113(b) of the CAA, 42 U.S.C. § 7413(b); and 28 U.S.C. §§ 1391(b) and (c) and 1395(a), because Merit resides and is located in this judicial district, certain violations alleged in the Complaint are alleged to have occurred in this judicial district, and because Merit waives any objection to venue in this judicial district.  For purposes of this Consent Decree, or any action to enforce this Consent Decree, Merit consents to this Court's jurisdiction over this Consent Decree, over any action to enforce this Consent Decree, and over Merit.  Merit also consents to venue in this judicial district.

2.     For purposes of this Consent Decree, Merit does not contest that the Complaint states claims upon which relief may be granted pursuant to Section 111 of the CAA, 42 U.S.C. § 7411.

2

3.      Notice of the commencement of this action shall be given to the State of Michigan as required by Section 113(b) of the CAA, 42 U.S.C. § 7413(b).

## II. <u>APPLICABILITY</u>

4.      The obligations of this Consent Decree apply to and are binding upon the United States and upon Merit and any successors, assigns, and other entities or persons otherwise bound by law.

5.      Effective from the Date of Entry of this Consent Decree and until either termination pursuant to Section XVI or transfer of the ownership or operation of the Covered Facility pursuant to this Paragraph 5 and Paragraph 6 below, Merit shall be covered by this Consent Decree. Effective from the Date of Entry of this Consent Decree, Merit shall give written notice of this Consent Decree to any successors in interest to the Covered Facility prior to the transfer of ownership or operation of any portion of the Covered Facility and shall provide a copy of this Consent Decree to any successor in interest.  Merit shall notify the United States, in accordance with the notice provisions set forth in Paragraph 54 of this Decree, of any successor in interest at least 30 days prior to any such transfer.  This provision does not apply to transferred equipment that is removed from, and not used at, a Covered Facility.

6.      Merit shall condition any transfer, in whole or in part, of ownership of, operation of, or other interest (exclusive of any non-controlling, non-operational shareholder or membership interest) in the Covered Facility upon the execution by the transferee of a modification to this Consent Decree, which makes the terms and conditions of this Consent Decree applicable to the

3

transferee.  In the event of transfer, Merit shall notify the United States as provided in Paragraph 5. By no earlier than 30 days after such Notice, Merit may file a motion to modify this Consent Decree with the Court to make the terms and conditions of this Consent Decree applicable to the transferee. Merit shall be released from the obligations and liabilities of this Consent Decree unless the United States opposes the motion and the Court finds that the transferee does not have the financial and technical ability to assume the obligations and liabilities under this Consent Decree.

7.      Merit shall provide a copy of all relevant portions of this Consent Decree to all officers, employees, and agents whose duties might reasonably include compliance with any provision of this Consent Decree, as well as to any contractor retained to perform work required under this Consent Decree.  The foregoing requirement may be satisfied by hard copy, electronic copy, or by providing on-line access with notice to the affected personnel.  Merit shall condition any such contract upon performance of the work in conformity with the applicable terms of this Consent Decree.

8.      In any action to enforce this Consent Decree, Merit shall not raise as a defense the failure by any of its officers, directors, employees, agents, or contractors to take any actions necessary to comply with the provisions of this Consent Decree.

### III. DEFINITIONS

9.      The terms used in this Consent Decree that are defined in the CAA or in federal and state regulations promulgated pursuant to the CAA shall have the meaning assigned to them in the

CAA or such regulations, unless otherwise provided in this Decree.  Whenever the terms set forth below are used in this Consent Decree, the following definitions shall apply:

a.      "Annual" or "annually" shall mean a calendar year, except as otherwise provided in applicable leak detection and repair ("LDAR") regulations.

b.      "Average" shall mean the arithmetic mean.

c.      "CAP" shall mean the Corrective Action Plan described in Paragraph 46 of this Consent Decree.

d.      "Complaint" shall mean the Complaint filed by the United States in this action.

e.      "Consent Decree" or "Decree" shall mean this Consent Decree and all appendices attached hereto, but in the event of any conflict between the text of this Consent Decree and any Appendix, the text of this Consent Decree shall control.

f.      "Covered Equipment" shall mean all Covered Types of Equipment in all Covered Process Units.

g.      "Covered Facility" shall mean the facility located at 1080 Prough Road SW, Kalkaska, Michigan, which is owned and operated by Merit.

h.      "Covered Process Units" shall mean all affected facilities (except compressors) that commenced construction, reconstruction or modification after January 20, 1984 within the meaning of 40 C.F.R. Part 60, Subpart KKK, at the Kalkaska Gas Plant North (or "KGPN") located at the Covered Facility, which includes the following process units:  cryogenic

5

plant, flare (utility system), gas dehydration, inlet gas (front end separation/heat exchange and amine plant), preboost compression, refrigeration system, stabilizer system, and storage tanks units.

i.      "Covered Types of Equipment" shall mean all valves in light liquid or gas/vapor service  (but excluding pressure relief devices) and pumps in light liquid or gas/vapor service that are regulated under any "equipment leak" provision of 40 C.F.R. Part 60.

j.      "Date of Lodging of this Consent Decree" or "Date of Lodging" shall mean the date that the United States files a "Notice of Lodging" of this Consent Decree with the Clerk of this Court for the purpose of providing notice and comment to the public.

k.      "Day," for purposes of requirements uniquely imposed by the Enhanced LDAR Program and not by any applicable LDAR provisions, shall mean a calendar day.   In computing any period of time under this Consent Decree for submittal of reports, where the last day would fall on a Saturday, Sunday, or federal or state holiday, the period shall include the next day that is not a Saturday, Sunday, or federal or state holiday.  For all other purposes, "day" shall have the meaning provided in the applicable LDAR regulations.

l.      "Defendant" shall mean Merit.

m.      "DOR" shall mean Delay of Repair.

n.      "Effective Date" shall have the meaning given in Section XIII (Effective Date).

o.      "ELP" or "Enhanced LDAR Program" shall mean the Enhanced Leak Detection and Repair Program specified in Paragraphs 13–53 of this Decree.

6

p.      "EPA" shall mean the United States Environmental Protection Agency and any of its successor departments or agencies.

q.      "Finding of Violation" shall mean the Finding of Violation issued by EPA Region 5 to Merit dated January 9, 2013.

r.      "LDAR" or "Leak Detection and Repair" shall mean the leak detection and repair activities required by any applicable "equipment leak" regulations set forth in 40 C.F.R. Part 60, Subparts KKK, VV, VVA and OOOO.  LDAR also shall mean any state or local equipment leak regulations that: require the use of Method 21 to monitor for equipment leaks and also require the repair of leaks discovered through such monitoring.

s.      "LDAR Audit Commencement Date" or "Commencement of an LDAR Audit" shall mean the first day of the on-site inspection that accompanies an LDAR audit.

t.      "LDAR Audit Completion Date" or "Completion of an LDAR Audit" shall mean 120 days after the LDAR Audit Commencement Date.

u.      "LDAR Personnel" shall mean all Merit's contractors and employees who perform any of the following activities at the Facility:  LDAR monitoring, LDAR data input, maintenance of LDAR monitoring devices, leak repairs on equipment subject to LDAR, and/or any other field duties generated by LDAR regulations or the ELP.

v.      "Low-Emissions Packing" or "Low-E Packing" shall mean either of the following:

(i)      A valve packing product, independent of any specific valve, for which the manufacturer has issued a written warranty that the packing

7

will not emit fugitives at greater than 100 ppm, and that, if it does so emit at greater than 100 ppm at any time in the first five years after installation, the manufacturer will replace the product; provided, however, that no packing product shall qualify as "Low-E" by reason of written warranty unless the packing first was tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for testing fugitive emissions; or

(ii)     A valve packing product, independent of any specific valve, that has been tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for testing fugitive emissions, and that, during the test, at no time leaked at greater than 500 ppm, and on average, leaked at less than 100 ppm.

w.     "Low-Emissions Valve" or "Low-E Valve" shall mean either of the following:

(i)     A valve (including its specific packing assembly or stem sealing component) for which the manufacturer has issued a written warranty that it will not emit fugitives at greater than 100 ppm, and that, if it does so emit at greater than 100 ppm at any time in the first five years after installation, the manufacturer will replace the valve; provided, however, that no valve shall qualify as "Low-E" by reason of written warranty unless the valve (including its specific packing assembly) either:

(a)     first was tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for testing fugitive emissions; or

(b)     is an "extension" of another valve that qualified as "Low-E" under Subparagraph (i)(a) above;

or

(ii)     A valve (including its specific packing assembly) that:

(a)     has been tested by the manufacturer or a qualified testing firm pursuant to generally-accepted good engineering practices for

8

testing fugitive emissions and that, during the test, at no time leaked at greater than 500 ppm, and on average, leaked at less than 100 ppm; or

(b)     is an "extension" of another valve that qualified as "Low-E" under Subparagraph (ii)*(a)* above.

For purposes of Subparagraphs (i)*(b)* and (ii)*(b)*, being an "extension of another valve" means that the characteristics of the valve that affect sealing performance (*e.g.*, type of valve, stem motion, tolerances, surface finishes, loading arrangement, and stem and body seal material, design, and construction) are the same or essentially equivalent as between the tested and the untested valve.

x.     "Method 21" shall mean the test method found at 40 C.F.R. Part 60, Appendix A, Method 21. To the extent that the Covered Equipment is subject to regulations that modify Method 21, those modifications shall be applicable.

y.     "Paragraph" shall mean a portion of this Consent Decree identified by an Arabic numeral.

z.     "Parties" shall mean the United States and Merit.

aa.     "Process Unit" means equipment assembled for the extraction of natural gas liquids from field gas, the fractionation of the liquids into natural gas products, or other operations associated with the processing of natural gas products. A process unit can operate independently if supplied with sufficient feed or raw materials and sufficient storage facilities for the products.

bb.     "Process Unit Shutdown" shall mean a work practice or operational procedure that stops production from a process unit or part of a process unit during which it is

9

technically feasible to clear process material from a process unit or part of a process unit consistent with safety constraints and during which repairs can be accomplished. The following are not considered Process Unit Shutdowns:

      (i)    An unscheduled work practice or operational procedure that stops production from a process unit or part of a process unit for less than 24 hours.

      (ii)    An unscheduled work practice or operational procedure that would stop production from a process unit or part of a process unit for a shorter period of time than would be required to clear the process unit or part of the process unit of materials and start up the unit, and would result in greater emissions than delay of repair of leaking components until the next scheduled Process Unit Shutdown.

      (iii)    The use of spare equipment and technically feasible bypassing of equipment without stopping production.

      cc.    "Quarter" or "quarterly" shall mean a calendar quarter (January through March, April through June, July through September, October through December) except as otherwise provided in applicable LDAR regulations.

      dd.    "Repair Verification Monitoring" shall mean the utilization of monitoring (or other method that indicates the relative size of the leak) to be completed by no later than the next calendar day after each attempt at repair of a leaking piece of equipment in order to determine whether the leak has been eliminated or is below the applicable leak definition in this ELP.

      ee.    "Screening Value" shall mean the highest emission level that is recorded at each piece of equipment as it is monitored in compliance with Method 21.

ff.     "Section" shall mean a portion of this Consent Decree that has a heading identified by a Roman numeral.

gg.     "Subsection" shall mean a portion of a Section of this Consent Decree that has a heading identified by a capital letter.

hh.     "United States" shall mean the United States of America, acting on behalf of EPA.

ii.     "Week" or "weekly" shall mean the standard calendar period, except as otherwise provided in applicable LDAR regulations.

### IV.  CIVIL PENALTY

10.     By no later than 30 days after the Effective Date of this Consent Decree, Merit shall pay the sum of $885,000 as a civil penalty.  Merit shall pay the civil penalty by FedWire Electronic Funds Transfer ("EFT") to the U.S. Department of Justice in accordance with written instructions to be provided to Merit by the Financial Litigation Unit of the U.S. Attorney's Office for the Western District of Michigan following lodging of the Consent Decree.  At the time of payment, Merit shall send a copy of the EFT authorization form, the EFT transaction record, and a transmittal letter: (i) to the United States in the manner set forth in Section VI of this Decree (Notices), (ii) by email to acctsreceivable.CINWD@epa.gov; and (iii) by mail to:

EPA Cincinnati Finance Office
26 Martin Luther King Drive
Cincinnati, Ohio 45268

11

The transmittal letter shall state that the payment is for the civil penalty owed pursuant to the Consent Decree in <u>United States v. Merit Energy Company, LLC</u>, and shall reference the civil action number, and DOJ case number 90-5-2-110951.

11.     If any portion of the civil penalty due to the United States is not paid when due, Merit shall pay interest on the amount past due, accruing from the Effective Date through the date of payment, at the rate specified in 28 U.S.C. § 1961.  Interest payment under this Paragraph shall be in addition to any stipulated penalty due.

12.     Merit shall not deduct any penalties paid under this Decree pursuant to this Section or Section VII (Stipulated Penalties) in calculating its federal income tax.

## V.  COMPLIANCE REQUIREMENTS

### A.  Applicability of the Enhanced LDAR Program (Subsection A)

13.     The requirements of this ELP shall apply to all Covered Equipment and all Covered Process Units at the Facility.  The requirements of this ELP are in addition to, and not in lieu of, the requirements of any other LDAR regulation that may be applicable to a piece of Covered Equipment.  If there is a conflict between an LDAR regulation and this ELP, Merit shall follow the more stringent of the requirements.

### B.  Facility-Wide LDAR Document (Subsection B)

14.     By no later than three months after the Effective Date of this Consent Decree, Merit shall develop a facility-wide document that describes:  (i) the facility-wide LDAR program (*e.g.*, applicability of regulations to process units and/or specific equipment; leak definitions; monitoring

frequencies); (ii) a tracking program (*e.g.*, Management of Change as provided in Paragraph 37) that ensures that new pieces of equipment added to the Facility for any reason are integrated into the LDAR program and that pieces of equipment that are taken out of service are removed from the LDAR program; (iii) the roles and responsibilities of all employee and contractor personnel assigned to LDAR functions at the Facility; (iv) how the number of personnel dedicated to LDAR functions is sufficient to satisfy the requirements of the LDAR program; and (v) how the Facility plans to implement this ELP.  Once developed, Merit shall review the facility-wide LDAR document annually and update it as needed by no later than December 31 of each year.

**C.  Monitoring Frequency and Equipment (Subsection C)**

15.    Beginning no later than six months after the Effective Date, for all Covered Equipment, Merit shall comply with the following periodic monitoring frequencies, unless: (i) more frequent monitoring is required by federal, state, or local laws or regulations; or (ii) the relevant Covered Process Unit has been permanently shut down:

    a.    Valves − Quarterly

    b.    Pumps − Monthly.

Compliance with the monitoring frequencies in this Paragraph 15 is not required when a specific, applicable LDAR provision excludes or exempts, fully or partially, monitoring at a periodic frequency (*e.g.*, an exemption for equipment that is designated as unsafe-to-monitor or difficult-to-monitor or an exemption for pumps that have no externally actuated shaft), provided that Merit satisfies all applicable conditions and requirements for the exclusion or exemption set forth in the

13

regulation.

16.     <u>Alternative Monitoring Frequencies for Valves After Two Years</u>.  At any time after two consecutive years of monitoring valves at the frequency specified in Paragraph 15.a, Merit may elect to comply with the monitoring requirements set forth in this Paragraph 16 by notifying EPA no later than three months prior to changing to the monitoring frequency specified under this Paragraph.  Merit may elect to comply with the monitoring requirements of this Paragraph at the Covered Process Units but may not make this election for anything less than all pieces of Covered Equipment in one entire Covered Process Unit.   An election to comply with the monitoring requirements of Subparagraph 16.a must include an election to comply with Subparagraph 16.b; Merit may not elect to comply with Subparagraph 16.a without also complying with Subparagraph 16.b.

a.     <u>For Valves that Have Not Leaked at any Time for at Least Two Consecutive Years of Monitoring</u>.  For valves that have not leaked at any time for at least the two years prior to electing this alternative, Merit shall monitor valves one time per year.  If any leaks are detected during this alternative monitoring schedule or during an LDAR audit or a federal, state or local audit or inspection, Merit immediately shall start monitoring the leaking valve (or valves) pursuant to the requirements of Subparagraph 16.b.

b.     <u>For Valves that Have Leaked at any Time in the Prior Two Years of Monitoring</u>.  For valves that have leaked at any time in the prior two years of monitoring, Merit shall monitor each such valve until it shows no leaks for six consecutive months, at which time

14

Merit may commence monitoring at the frequency set forth in Subparagraph 16.a. The alternative monitoring schedule shall continue to apply to non-leaking valves in the Covered Process Unit.

17.     Beginning no later than six months after the Effective Date, for all Covered Equipment, Merit shall comply with Method 21 in performing LDAR monitoring, using an instrument attached to a data logger (or an equivalent instrument) which directly records electronically the Screening Value detected at each piece of Covered Equipment, the date and time that each Screening Value is taken, and the identification numbers of the monitoring instrument and the technician.  Merit shall transfer this monitoring data to an electronic database on at least a weekly basis for recordkeeping purposes.

18.     If, during monitoring in the field, a piece of Covered Equipment is discovered that is not listed in the data logger, Merit is permitted to monitor the piece of Covered Equipment and record, by any means available, the Screening Value, the date and time of the Screening Value, and the identification numbers of the monitoring instrument and technician. In such an instance, the failure to initially record the information electronically, in the data logger, does not constitute a violation of this Paragraph's requirement to record the required information electronically, provided that Merit thereafter promptly adds the piece of Covered Equipment and the information regarding the monitoring event to the LDAR database.

15

**D.  Leak Detection and Repair Action Levels (Subsection D)**

19.    Action Levels

a.    Beginning no later than six months after the Effective Date of this Consent Decree and continuing until termination, for all leaks from Covered Equipment detected at or above the leak definitions listed in Table 1 for each of the specific Covered Types of Equipment, Merit shall perform repairs in accordance with Paragraphs 20–25.

Table 1:  Leak Definitions for Covered Types of Equipment

| Covered Type of Equipment | Lower Leak Definition (ppm) |
|---|---|
| Valves | 500 |
| Pumps | 2,000 |

b.    For purposes of these lower leak definitions, Merit may elect to adjust or not to adjust the monitoring instrument readings for background pursuant to any provisions of applicable LDAR requirements that address background adjustment, provided that Merit complies with the requirements for doing so or not doing so.

c.    Beginning no later than six months after the Effective Date of this Consent Decree, for all Covered Equipment, and all valves and pumps in heavy liquid service, at any time, including outside of periodic monitoring, evidence of a potential leak is detected through audio, visual, or olfactory sensing, Merit shall comply with all applicable regulations and, if repair is required, with Paragraphs 20–25.

16

E.  **Repairs (Subsection E)**

20.     Except as provided in Subparagraph 31.d.i, by no later than five days after detecting a leak, Merit shall perform a first attempt at repair.  By no later than 15 days after detection, Merit shall perform a final attempt at repair of the leaking piece of Covered Equipment or may place the piece of Covered Equipment on the Delay of Repair list provided that Merit has complied with all applicable regulations and with the requirements of Paragraphs 21–25 and 27 (valve replacement and improvement).

21.     Except as provided in Subparagraph 31.d.i, beginning no later than six months after the Effective Date of this Consent Decree and continuing until termination, Merit shall perform Repair Verification Monitoring as set forth in Paragraphs 22 - 25.

22.     <u>Repair Attempt for Valves (other than Control Valves) with Screening Values greater than or equal to 250 and less than 500 ppm</u>.  For any valve, excluding control valves, that has a Screening Value greater than or equal to 250 and less than 500 ppm, Merit shall make an initial attempt to repair the valve and eliminate the leak by no later than five days after detecting the leak.  Repair Verification Monitoring shall be performed to determine if the initial repair has been successful.  If, upon Repair Verification Monitoring, the Screening Value is less than 500 ppm, no further actions shall be required for that monitoring event for that valve.  If, upon Repair Verification Monitoring, the Screening Value is greater than or equal to 500 ppm, Merit shall undertake the requirements for repair required by this Consent Decree (and all deadlines for such requirements shall be based on the date of the failed Repair Verification Monitoring).

17

23.    Drill and Tap for Valves (other than Control Valves).

a.    Except as provided in Subparagraph 23.b, for leaking valves (other than control valves), when other repair attempts have failed to reduce emissions below the applicable leak definition and Merit is not able to remove the leaking valve from service, Merit shall attempt at least one drill-and-tap repair (with a second injection of an appropriate sealing material if the first injection is unsuccessful at repairing the leak) before placing the valve (other than provisionally, as set forth in Subparagraph 23.c) on the DOR list.

b.    Drill-and-tap is not required: (i) when Subparagraph 31.d.i applies; or (ii) when there is a major safety, mechanical, product quality, or environmental issue with repairing the valve using the drill-and-tap method, in which case, Merit shall document the reason(s) why any drill-and-tap attempt was not performed prior to placing any valve on the DOR list.

c.    If a drill-and-tap attempt can reasonably be completed within the 15-day repair period, Merit shall complete the drill-and-tap attempt in that time period.  If a drill-and-tap attempt cannot reasonably occur within the 15-day repair period (*e.g.,* if Merit's drill-and-tap contractor is not local and must mobilize to the Facility), Merit provisionally may place the valve on the DOR list pending attempting the drill-and-tap repair as expeditiously as practical.  In no event may Merit take more than 30 days from the initial monitoring to attempt a drill-and-tap repair.  If upon Repair Verification Monitoring, drill-and-tap is deemed successful by reference to a Screening Value of less than 500 ppm, the valve shall be removed from the provisional DOR list and considered repaired.

18

24.     Except as provided in Subparagraph 31.d.i , for each leak, Merit shall record the following information:  the date of all repair attempts; the repair methods used during each repair attempt; the date, time and Screening Values for all re-monitoring events; and, if applicable, documentation of compliance with Paragraphs 23 and 26 for Covered Equipment placed on the DOR list.

25.     Nothing in Paragraphs 20–24 is intended to prevent Merit from taking a leaking piece of Covered Equipment out of service; provided, however, that prior to placing the leaking piece of Covered Equipment back in service, Merit must repair the leak or must comply with the requirements of Subsection F (Delay of Repair) to place the piece of Covered Equipment on the DOR list.

**F.   Delay of Repair (Subsection F)**

26.     Beginning no later than the Effective Date of this Consent Decree for the requirements in Subparagraphs 26.b and 26.c.(i), and beginning no later than three months after the Effective Date of this Consent Decree for the other requirements set forth below in this Paragraph, for all Covered Equipment placed on the DOR list, Merit shall:

a.     Require sign-off from the relevant process unit supervisor or person of similar authority that the piece of Covered Equipment is technically infeasible to repair without a Process Unit Shutdown;

b.     Undertake periodic monitoring of the Covered Equipment placed on the DOR list at the frequency specified in Paragraph 15 required for other pieces of Covered

19

Equipment of that type in the process unit; and

        c.      (i) Repair the piece of Covered Equipment within the time frame required by the applicable LDAR regulation; or (ii) if applicable under Subsection G, replace, repack, or improve the piece of Covered Equipment by the timeframes set forth in Subsection G.

**G.  Valve Replacement and Improvement Program (Subsection G)**

      27.      Commencing no later than six months after the Effective Date of this Consent Decree, and continuing until termination, Merit shall implement the program set forth in Paragraphs 28–36 to improve the emissions performance of the valves that are Covered Equipment in each Covered Process Unit. All references to "valves" in Paragraphs 28–36 exclude pressure relief valves.

      28.      <u>List of all Existing Valves in the Covered Process Units.</u>  In the first compliance status report required under Paragraph 49, Merit shall include a list of the tag numbers of all valves subject to this ELP, broken down by Covered Process Unit, that are in existence as of the Effective Date. The valves on this list shall be the "Existing Valves" for purposes of Paragraphs 29–31.

      29.      <u>Proactive Initial Valve Tightening Work Practices Relating to each New Valve that Is Installed and each Existing Valve that Is Repacked.</u>  Merit shall undertake the following work practices with respect to each new valve that is subject to LDAR that is installed (whether the new valve replaces an Existing Valve or is newly added to a Covered Process Unit) and each Existing Valve that is repacked:

        a.      Upon installation (or re-installation in the case of repacking), Merit shall

tighten the valve's packing gland nuts or their equivalent (*e.g.*, pushers) to: (i) the manufacturer's recommended gland nut or packing torque; or (ii) any appropriate tightness that will minimize the potential for fugitive emission leaks of any magnitude. This practice shall be implemented prior to the valve's exposure (or re-exposure, in the case of repacking) to process fluids.

30. <u>Installing New Valves</u>. Except as provided in Subparagraphs 30.a, 30.b, or Paragraph 33, Merit shall ensure that each new valve (other than a valve that serves as the closure device on an open-ended line) that it installs in each Covered Process Unit, and that, when installed, will be regulated under LDAR, either is a Low-E Valve or is fitted with Low-E Packing. This requirement applies to entirely new valves that are added to a Covered Process Unit and to Existing Valves that are replaced for any reason in a Covered Process Unit.

a. Paragraph 30 shall not apply in emergencies or exigent circumstances requiring immediate installation or replacement of a valve where a Low-E Valve or Low-E Packing is not available on a timely basis. Any such instance shall be reported in the next ELP compliance status report.

b. Paragraph 30 shall not apply to valves that are installed temporarily for a short-term purpose and then removed (*e.g.*, valves connecting a portion of the Covered Process Unit to a testing device).

31. <u>Replacing or Repacking Existing Valves that Have Screening Values at or above 500 ppm with Low-E Valves or Low-E Packing</u>.

a. <u>Existing Valves Required to Be Replaced or Repacked</u>. Except as provided

21

in Paragraph 33, for each Existing Valve that has a Screening Value at or above 500 ppm during any monitoring event, Merit shall either replace or repack the Existing Valve with a Low-E Valve or with Low-E Packing.

       b.    <u>Timing:  If Replacing or Repacking Does Not Require a Process Unit Shutdown</u>.  If replacing or repacking does not require Process Unit Shutdown, Merit shall replace or repack the Existing Valve by no later than 30 days after the monitoring event that triggers the replacing or repacking requirement, unless Merit complies with the following:

         i.    Prior to the deadline, Merit must take all actions necessary to obtain the required valve or valve packing, including all necessary associated materials, as expeditiously as practical, and retain documentation of the actions taken and the date of each such action;

         ii.    If, despite Merit's efforts to comply with Subparagraph 31.b.i, the required valve or valve packing, including all necessary associated materials, is not available in time to complete the installation within 30 days, Merit must take all reasonable actions to minimize emissions from the valve pending completion of the required replacing or repacking.  Examples include:

            *(a)*    Repair;

            *(b)*    More frequent monitoring, with additional repairs as needed; or

            *(c)*    Where practical, interim replacing or repacking of a valve with a valve that is not a Low-E Valve or with packing that is not Low-E Packing; and

         iii.    Merit must promptly perform the required replacing or repacking after Merit's receipt of the valve or valve packing, including all necessary associated materials.

22

c.    Timing: If Replacing or Repacking Requires a Process Unit Shutdown.  If replacing or repacking requires a Process Unit Shutdown, Merit shall replace or repack the Existing Valve during the first Process Unit Shutdown that follows the monitoring event that triggers the requirement to replace or repack the valve, unless Merit documents that insufficient time existed between the monitoring event and the Process Unit Shutdown to enable Merit to purchase and install the required valve or valve packing technology.  In that case, Merit shall undertake the replacing or repacking at the next Process Unit Shutdown that occurs after Merit's receipt of the valve or valve packing, including all necessary associated materials.

d.    Actions Required Pending Replacings or Repackings Pursuant to Subparagraph 31.a-c.

i.    Actions Required Pursuant to Subsection E:

Merit shall not be required to comply with Subsection E (Repairs) e.g. drill and tap, pending replacing or repacking pursuant to Subparagraphs 31.a-c if Merit completes the replacing or repacking by the date that is no later than 30 days after detecting the leak.  If Merit does not complete the replacing or repacking within 30 days, or if at the time of the leak detection Merit reasonably can anticipate that it might not be able to complete the replacing or repacking within 30 days, Merit shall comply with all applicable requirements of Subsection E (Repairs).

ii.    Actions Required Pursuant to Applicable Regulations.

For each Existing Valve that has a Screening Value at or above 500 ppm, Merit shall comply with all applicable regulatory requirements, including repair and "delay of repair," pending replacing or repacking pursuant to Subparagraphs 31.a-c.

23

32.     <u>Provisions Related to Low-E Valves and Low-E Packing</u>.

    a.     <u>Low-E Status Not Affected by Subsequent Leaks</u>.  If, during monitoring or after installation, a Low-E Valve or a valve using Low-E Packing has a Screening Value at or above 500 ppm, the leak is not a violation of this Decree, does not invalidate the "Low-E" status or use of that type of valve or packing technology, and does not require replacing other, non-leaking valves or packing technology of the same type.

    b.     <u>Repairing Low-E Valves</u>.  If, during monitoring after installation, a Low-E Valve or a valve using Low-E Packing has a Screening Value at or above 500 ppm, Paragraphs 20, 21, 23, 24, 25 and 26 shall apply.

    c.     <u>Replacing or Repacking Low-E Valves</u>.    On any occasion when a Low-E Valve or a valve that utilizes Low-E Packing has a Screening Value at or above 500 ppm, Merit shall replace or repack it pursuant to the requirements of Paragraph 31.

33.     <u>Commercial Unavailability of a Low-E Valve or Low-E Packing</u>.  Merit shall not be required to utilize a Low-E Valve or Low-E Packing to replace or repack a valve if a Low-E Valve or Low-E Packing is commercially unavailable.  The factors relevant to the question of commercial unavailability and the procedures that Merit must follow to assert that a Low-E Valve or Low-E Packing is commercially unavailable are set forth in Appendix A.

34.     <u>Records of Low-E Valves and Low-E Packing</u>.  Prior to installing any Low-E Valves or Low-E Packing, or if not possible before installation, then as soon as possible after installation, Merit shall secure from each manufacturer documentation that demonstrates that the proposed valve

24

or packing technology meets the definition of "Low-E Valve" and/or "Low-E Packing." Merit shall make the documentation available upon request.

35.     Nothing in Paragraphs 30–33 requires Merit to utilize any valve or valve packing technology that is not appropriate for its intended use in a Covered Process Unit.

36.     In each Compliance Status Report due under Paragraph 49 of this Decree, Merit shall include a separate section in the Report that: (i) describes the actions it took to comply with this Subsection G, including identifying each piece of equipment that triggered a requirement in Subsection G, the Screening Value for that piece of equipment, the type of action taken (*i.e.*, replacement, repacking, or improvement, and the date when the action was taken); (ii) identifies any required actions that were not taken and explains why; and (iii) identifies the schedule for any known, future replacements, repackings, improvements, or eliminations.

H.   Management of Change (Subsection H)

37.     Management of Change.  To the extent not already done, beginning no later than three months after the Effective Date of this Consent Decree, Merit shall ensure that each valve and pump added to the Covered Process Units at the Covered Facility for any reason is evaluated to determine if it is subject to LDAR regulations.  Merit also shall ensure that each valve and pump that was subject to the LDAR program is eliminated from the LDAR program if it is physically removed from a Covered Process Unit.  This evaluation shall be a part of Merit's facility-wide Management of Change protocol.

I. Training (Subsection I)

38. By no later than nine months after the Effective Date of this Consent Decree, Merit shall develop a training protocol (or, as applicable, require its contractor to develop a training protocol for the contractor's employees) and shall ensure that all LDAR Personnel have completed training on all aspects of LDAR, including this ELP, that are relevant to the person's duties. Once per calendar year starting in the calendar year after completion of initial training, Merit shall ensure that refresher training is performed with respect to each employee or contractor; provided, however, that refresher training is not required if an individual's employment at the Facility ceases prior to the end of the calendar year or no longer involves duties relevant to LDAR. Beginning no later than the Effective Date of this Consent Decree and continuing until termination of this Consent Decree, Merit shall ensure (or as applicable, require its contractor to ensure for the contractor's employees) that new LDAR Personnel are sufficiently trained prior to any field involvement (other than supervised involvement for purposes of training) in the LDAR program.

J. Quality Assurance ("QA")/Quality Control ("QC") (Subsection J)

39. Daily Certification by Monitoring Technicians. Commencing by no later than one month after the Effective Date of this Consent Decree, on each day that monitoring occurs, at the end of such monitoring, Merit shall ensure that each monitoring technician certifies that the data collected accurately represents the monitoring performed for that day by requiring the monitoring technician to sign a form that includes the following certification:

> On [insert date], I reviewed the monitoring data that I collected today
> and to the best of my knowledge and belief, the data accurately

26

represents the monitoring that I performed today.

40.     Commencing by no later than the first full calendar quarter after the Effective Date of this Consent Decree, at times that are not announced to the LDAR monitoring technicians, an LDAR-trained employee or contractor of Merit, who does not serve on a routine basis as an LDAR monitoring technician at the Facility, shall undertake the following no less than once per calendar quarter:

a.      Verify that equipment was monitored at the appropriate frequency;

b.      Verify that proper documentation and sign-offs have been recorded for all equipment placed on the DOR list;

c.      Ensure that repairs have been performed in the required periods;

d.      Review monitoring data and equipment counts (e.g., number of pieces of equipment monitored per day) for feasibility and unusual trends;

e.      Verify that proper calibration records and monitoring instrument maintenance information are maintained;

f.      Verify that other LDAR program records are maintained as required; and

g.      Observe in the field each LDAR monitoring technician who is conducting leak detection monitoring to ensure that monitoring during the quarterly QA/QC is being conducted as required.

Merit promptly shall correct any deficiencies detected or observed.  Merit shall maintain a log that: (i) records the date and time that the reviews, verifications, and observations required by

27

this Paragraph are undertaken; and (ii) describes the nature and timing of any corrective actions taken.

K.  **LDAR Audits and Corrective Action (Subsection K)**

41.    LDAR Audit Schedule:  Until termination of this Consent Decree, Merit shall ensure that an LDAR audit of all Covered Process Units at the Covered Facility is conducted once every two years in accordance with the following schedule:  for the first LDAR audit, the LDAR Audit Commencement Date shall be no later than twelve months after the Effective Date of this Consent Decree; for each subsequent LDAR audit, the LDAR Audit Completion Date shall occur within the same calendar quarter that the first LDAR Audit Completion Date occurred.

42.    Requirements related to persons conducting LDAR audits.  For the LDAR audits to be conducted every two years under this Consent Decree, Merit shall retain a third party with experience in conducting LDAR audits.   Merit shall select a different company than the Facility's regular LDAR contractor to perform the third-party audit and Merit may not hire that company as the Facility's regular LDAR contractor during the life of this Consent Decree.

43.    For each Covered Process Unit, each LDAR audit shall include: (i) reviewing compliance with all applicable LDAR regulations, including LDAR requirements related to valves and pumps in heavy liquid service; (ii) reviewing and/or verifying the same items that are required to be reviewed and/or verified in Subparagraphs 40.a-40.f; (iii) reviewing whether any pieces of equipment that are required to be in the LDAR program are not included; and (iv) "comparative monitoring" as described in Paragraph 44.  LDAR audits after the first audit also shall include

28

reviewing the Facility's compliance with this ELP.

44. <u>Comparative Monitoring</u>. Comparative monitoring during LDAR Audits shall be undertaken as follows:

a. <u>Calculating a Comparative Monitoring Audit Leak Percentage.</u> Covered Types of Equipment shall be monitored in order to calculate a leak percentage for the Covered Process Units. For descriptive purposes under this Section, the monitoring that takes place during an LDAR Audit shall be called "comparative monitoring" and the leak percentages derived from the comparative monitoring shall be called the "Comparative Monitoring Audit Leak Percentages." Merit shall undertake comparative monitoring of the Covered Types of Equipment in the Covered Process Units during each LDAR Audit. In undertaking Comparative Monitoring, Merit shall not be required to monitor every component in each Covered Process Unit.

b. <u>Calculating the Historic, Average Leak Percentage from Prior Periodic Monitoring Events</u>. The historic, Average Leak percentage from prior periodic monitoring events, broken down by Covered Type of Equipment shall be calculated. Four complete monitoring periods immediately preceding the comparative monitoring shall be used for this purpose. The preceding monitoring periods may comprise a mix of the monitoring periods and frequencies specified in Paragraph 15, 16 or 17.

c. <u>Calculating the Comparative Monitoring Leak Ratio</u>. For the Covered Process Units, the ratio of the Comparative Monitoring Audit Leak Percentage from Subparagraph 44.a to the historic, average leak percentage from Subparagraph 44.b shall be calculated. This ratio

29

shall be called the "Comparative Monitoring Leak Ratio."  If the denominator in this calculation is "zero," it shall be assumed (for purposes of this calculation but not for any other purpose under this Consent Decree or under any applicable laws and regulations) that one leaking piece of Covered Equipment was found in the process unit through routine monitoring during the 12-month period before the comparative monitoring.

45.     <u>When More Frequent Periodic Monitoring is Required</u>.  If a Comparative Monitoring Audit Leak Percentage calculated pursuant to Subparagraph 44.a triggers a more frequent monitoring schedule under any applicable federal, state, or local law or regulation than the frequencies listed in either Paragraph 15, 16, or 17 as applicable for the Covered Type of Equipment in that Covered Process Unit, Merit shall monitor the Covered Type of Equipment at the greater frequency unless and until less frequent monitoring is again allowed under the specific federal, state, or local law or regulation.  At no time may Merit monitor at intervals less frequently than those listed in the applicable Paragraph in Subsection V.C.

46.     <u>Corrective Action Plan ("CAP")</u>.

a.     <u>Requirements of a CAP</u>.  By no later than the date that is 30 days after each LDAR Audit Completion Date, Merit shall develop a preliminary Corrective Action Plan if:  (i) the results of an LDAR audit identify any deficiencies; or (ii) a Comparative Monitoring Leak Ratio calculated pursuant to Subparagraph 44.c is 3.0 or higher and the Comparative Monitoring Audit Leak Percentage calculated pursuant to Subparagraph 44.a is greater than or equal to 0.5 percent. The preliminary CAP shall describe the actions that Merit has taken or shall take to address: (i) the

30

deficiencies and/or (ii) the causes of a Comparative Monitoring Leak Ratio that is 3.0 or higher (but only if the Comparative Monitoring Audit Leak Percentage is at or above 0.5 percent). Merit shall include a schedule by which actions that have not yet been completed shall be completed. Merit promptly shall complete each corrective action item with the goal of completing each action within 90 days after the LDAR Audit Completion Date. If any action is not completed or not expected to be completed within 90 days after the LDAR Audit Completion Date, Merit shall explain the reasons and propose a schedule for prompt completion in the final CAP to be submitted under Subparagraph 46.b.

        b.     <u>Submission of the Final CAP to EPA</u>. By no later than 120 days after the LDAR Audit Completion Date, Merit shall submit the final CAP to EPA, together with a certification of the completion of each item of corrective action. If any action is not completed within 90 days after the LDAR Audit Completion Date, Merit shall explain the reasons, together with a proposed schedule for prompt completion. Merit shall submit a supplemental certification of completion by no later than 30 days after completing all actions.

        c.     <u>EPA Comment on CAP</u>. EPA may submit comments on the CAP. Within 30 days after receipt of any comments from EPA, Merit shall submit a reply. Disputes arising with respect to any aspect of a CAP shall be resolved in accordance with the dispute resolution provisions of this Decree.

L. Certification of Compliance (Subsection L)

47.     Within 180 days after the initial LDAR Audit Completion Date, Merit shall certify to EPA that, to the signer's best knowledge and belief formed after reasonable inquiry: (i) except as otherwise identified, the Facility is in compliance with all applicable LDAR regulations and this ELP; (ii) Merit has completed all corrective actions, if applicable, or is in the process of completing all corrective actions pursuant to a CAP; and (iii) all equipment at the Facility that is regulated under LDAR has been identified and included in the Facility's LDAR program.   To the extent that Merit cannot make the certification in all respects, it shall specifically identify any deviations from Items (i)–(iii) in this Paragraph.

M. Recordkeeping and Reporting (Subsection M)

48.     Merit shall keep all records required by this ELP, including each LDAR audit report, to document compliance with the requirements of this ELP as provided in Paragraph 84.   Upon request by EPA, Merit shall make all such documents available to EPA and shall provide, in electronic format if so requested, all LDAR monitoring data generated during the life of this Consent Decree.

32

49. <u>ELP Compliance Status Reports</u>. On the dates and for the time periods set forth in Paragraph 50, Merit shall submit to EPA, in the manner set forth in Section VI (Notices), Paragraph 54, the following information:

a. The number of LDAR Personnel at the Facility (excluding Personnel whose functions involve the non-monitoring aspects of repairing leaks) and the approximate percentage of time each such person dedicated to performing his/her LDAR functions;

b. An identification and description of any non-compliance with the requirements of Section V (Compliance Requirements);

c. An identification of any problems encountered in complying with the requirements of Section V (Compliance Requirements);

d. The information required by Paragraph 36;

e. The information required by Paragraph 40 of Subsection V.G;

f. A description of the trainings done in accordance with this Consent Decree;

g. Any deviations identified in the QA/QC performed under Subsection V.J, as well as any corrective actions taken under that Subsection;

h. A summary of LDAR audit results including specifically identifying all alleged deficiencies; and

i. The status of all actions under any CAP that was submitted during the reporting period, unless the CAP was submitted less than one month before the compliance status report.

33

50.   <u>Due Dates</u>.  The first compliance status report shall be due 31 days after the first full year after the Effective Date of this Consent Decree until termination of this Decree, and each subsequent report will be due annually on the same date in the following year and shall cover the prior full year.

51.   Each report submitted under this Consent Decree shall be signed by a Merit official (head of those responsible for environmental management and compliance), and shall include the following certification:

> I certify under penalty of law that this document and all attachments were prepared under my direction or supervision in accordance with a system designed to assure that qualified personnel properly gather and evaluate the information submitted.  Based on my inquiry of the person or persons who manage the system, or those persons directly responsible for gathering the information, the information submitted is, to the best of my knowledge and belief, true, accurate, and complete.

52.   All Reports under this Consent Decree shall be submitted to EPA in the manner designated in Section VI of this Consent Decree (Notices).

53.   The reporting requirements of this Consent Decree do not relieve Merit of any reporting obligations required by the CAA or implementing regulations, or by any other federal, state, or local law, regulation, permit, or other requirement. The reporting requirements of this Section are in addition to any other reports, plans or submissions required by other Sections of this Consent Decree.

34

## VI.  <u>NOTICES</u>

54.    Unless otherwise specified herein, whenever notifications, submissions, or communications are required by this Consent Decree, they shall be made in writing and addressed to the persons set forth below.  Submission of hard copies is required and shall be sufficient to comply with the notice requirements of this Consent Decree.  The email addresses listed below are to permit the submission of courtesy copies.

<u>Notice or submission to the United States</u>:

<u>Department of Justice:</u>

Chief, Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
Box 7611 Ben Franklin Station
Washington, DC 20044-7611
Re: DOJ No. 90-5-2-110951

<u>EPA</u>

Air and Radiation Division
EPA Region 5
77 W. Jackson Blvd. (AE-17J)
Chicago, IL 60604
Attn: Compliance Tracker

Office of Regional Counsel
EPA Region 5
77 West Jackson Blvd. (C-14J)
Chicago, IL 60604

Notice or submission to EPA only:

     Air and Radiation Division
     EPA Region 5
     77 W. Jackson Blvd. (AE-17J)
     Chicago, IL 60604
     Attn: Compliance Tracker

     and

     Office of Regional Counsel
     EPA Region 5
     77 West Jackson Blvd. (C-14J)
     Chicago, IL 60604

     For courtesy purposes only, electronic copies to:

     loukeris.constantinos@epa.gov
     carlson.deborahA@epa.gov

Notice or submission to Merit:

     Sean Craven, Regulatory Analyst
     Merit Energy Kalkaska Gas Plant
     1510 Thomas Road SW
     Kalkaska, Michigan 49646

     and

     Jeffrey W. Schwarz
     Carver Schwarz McNab Kamper and Forbes, LLC
     1600 Stout Street, Suite 1700
     Denver, Colorado 80202

     For courtesy purposes only, electronic copies to:

     sean.craven@meritenergy.com
     jschwarz@csmkf.com

55.     Any Party may, by written notice to the other Party, change its designated notice recipient(s) or notice address(es) provided above.  Notices submitted pursuant to this Section shall be deemed submitted upon mailing, unless otherwise provided in this Consent Decree or by mutual agreement of the Parties in writing.

## VII.  STIPULATED PENALTIES

56.     Failure to Pay Civil Penalty.  If Defendant fails to pay any portion of the civil penalty required to be paid under Section IV of this Decree (Civil Penalty) when due, Defendant shall pay a stipulated penalty of $2,500 per day for each day that the payment is late.  Late payment of the civil penalty and any accrued stipulated penalties shall be made in accordance with Paragraph 10.

57.     Failure to Meet ELP Consent Decree Obligations.  Defendant shall be liable for stipulated penalties to the United States for violations of this Consent Decree as specified in Table 2 below unless excused under Section VIII (Force Majeure).

**Table 2**

| Violation | Stipulated Penalty | |
|---|---|---|
| 57.a.  Failure to timely develop a Facility-Wide LDAR document as required by Paragraph 14 or failure to timely update the document on an annual basis if needed pursuant to Paragraph 14 | Period of noncompliance | Penalty per day late |
| | 1 - 15 days | $300 |
| | 16 - 30 days | $400 |
| | 31 days or more | $500 |

37

| Violation | Stipulated Penalty |
|---|---|
| 57.b.  Each failure to perform monitoring at the frequencies set forth in Paragraph 15 or, if applicable, Paragraphs 16 and 17 | $100 per component per missed monitoring event, not to exceed $25,000 per month per Covered Process Unit |
| 57.c.  Each failure to comply with Method 21 in performing LDAR monitoring, in violation of Paragraph 17 | Monitoring frequency for the component    Penalty per monitoring event per process unit<br><br>Every 2 years         $25,000<br>Annual                   $20,000<br>Semi-Annual          $15,000<br>Quarterly               $10,000<br>Monthly                 $5,000 |
| 57.d.  For each failure to use a monitoring device that is attached to a datalogger and for each failure, during each monitoring event, to directly electronically record the Screening Value, date, time, identification number of the monitoring instrument, and the identification of technician, in violation of these requirements of Paragraph 18 | $100 per failure per piece of equipment monitored |
| 57.e.  Each failure to transfer monitoring data to an electronic database on at least a weekly basis, in violation of this requirement in Paragraph 18 | $150 per day for each day that the transfer is late |

| Violation | Stipulated Penalty | | |
|---|---|---|---|
| 57.f.  Each failure to timely perform a first repair as required by Paragraph 20 or 22.  For purposes of these stipulated penalties, the term "repair" includes the required remonitoring in Paragraph 22 after the repair attempt; the stipulated penalties in Subparagraph 57.h do not apply. | $150 per day for each late day, not to exceed $1,500 per leak | | |
| 57.g.  Each failure to timely perform a final attempt at repair as required by Paragraph 20 unless not required to do so under Subparagraph 31.d.  For purposes of these stipulated penalties, the term "repair" includes the required remonitoring in Paragraph 22 after the repair attempt; the stipulated penalties in Subparagraph 57.h do not apply. | Equipment type | Penalty per component per day late | Not to exceed |
| | Valves | $300 | $37,500 |
| | Pumps | $1,200 | $150,000 |
| 57.h.  Each failure to timely perform Repair Verification Monitoring as required by Paragraph 21 in circumstances where the first attempt to adjust, or otherwise alter, the piece of equipment to eliminate the leak was made within five days and the final attempt to adjust, or otherwise alter, the piece of equipment to eliminate the leak was made within 15 days | Equipment type | Penalty per component per day late | Not to exceed |
| | Valves | $150 | $18,750 |
| | Pumps | $600 | $75,000 |

39

| Violation | Stipulated Penalty |
|---|---|
| 57.i.  Each failure to undertake the drill-and-tap method as required by Paragraph 23 | Period of noncompliance  /  Penalty per component per day late<br><br>Between 1 and 15 days — $200<br>Between 16 and 30 days — $350<br>Over 30 days — $500 per day for each day over 30, not to exceed $37,500 |
| 57.j.  Each failure to record the information required by Paragraph 25 | $100 per component per item of missed information |
| 57.k.  Each improper placement of a piece of Covered Equipment on the DOR list (e.g., placing a piece of Covered Equipment on the DOR list even though it is feasible to repair it without a Process Unit Shutdown) required by Paragraph 20 | Equipment type  /  Penalty per component per day on list  /  Not to exceed<br><br>Valve — $300 — $75,000<br>Pumps — $1,200 — $300,000 |
| 57.l.  Each failure to comply with the requirement in Subparagraph 26.a that a relevant unit supervisor or person of similar authority sign off on placing a piece of Covered Equipment on the DOR list | $250 per piece of Covered Equipment |
| 57.m.  Each failure to comply with the requirements of Subparagraph 26.c.(i) | Refer to the applicable stipulated penalties in Subparagraphs 57.f and 57.g |

40

| Violation | Stipulated Penalty |
|---|---|
| 57.n.  Each failure to comply with the requirements of Subparagraph 26.c.(ii) | Refer to the applicable stipulated penalties in Subparagraphs 57.p – 57.u. |
| 57.o.  Each failure to comply with the work practice standards in Paragraph 29 | $50 per violation per valve per day, not to exceed $30,000 for all valves in a Covered Process Unit per quarter. |
| 57.p.  Each failure to install a Low-E Valve or a valve fitted with Low-E Packing when required to do so pursuant to Paragraph 30 | $20,000 per failure, except as provided in Paragraph 58 below |
| 57.q.  Each failure, in violation of Subparagraph 32.b, to timely comply with the requirements relating to installing a Low-E Valve or Low-E Packing if a Process Unit Shutdown is not required | $500 per day per failure, not to exceed $20,000, except as provided in Paragraph 58 below |
| 57.r.  Each failure, in violation of Subparagraph 32.c, to install a Low-E Valve or Low-E Packing when required to do so during a Process Unit Shutdown | $20,000 per failure, except as provided in Paragraph 58 below |
| 57.s.  Each failure to add a piece of Covered Equipment to the LDAR program when required to do so pursuant to the evaluation required by Paragraph 37 (MOC) | $300 per piece of Covered Equipment (plus an amount, if any, due under Paragraph 57.b for any missed monitoring event related to a component that should have been added to the LDAR program but was not) |

41

| Violation | Stipulated Penalty |
|---|---|
| 57.t.  Each failure to remove a piece of Covered Equipment from the LDAR program when required to do so pursuant to Paragraph 37 | $150 per failure per piece of Covered Equipment |
| 57.u.  Each failure to timely develop a training protocol as required by Paragraph 38 | $50 per day late |
| 57.v.  Each failure to perform initial, refresher, or new personnel training as required by Paragraph 38 | $1,000 per person per month late |
| 57.w.  Each failure of a monitoring technician to complete the certification required in Paragraph 39 | $100 per failure per technician |
| 57.x.  Each failure to perform any of the requirements relating to QA/QC in Paragraph 39 | $1,000 per missed requirement per quarter |
| 57.y.  Each failure to conduct an LDAR audit in accordance with the schedule set forth in Paragraph 41 | Period of noncompliance    Penalty per day<br><br>1-15 days                      $300<br>16-30 days                    $400<br>31 days or more            $500, not to<br>          exceed $100,000<br>          per audit |

| Violation | Stipulated Penalty |
|---|---|
| 57.z.  Each failure to use a third party as an auditor; each use of a third party auditor that is not experienced in LDAR audits; and each use of Defendant's regular LDAR contractor to conduct the third party audit, in violation of the requirements of Paragraph 42 | $25,000 per audit |
| 57.aa.  Except for the requirement to undertake Comparative Monitoring, each failure to substantially comply with the LDAR audit requirements in Paragraph 43 | $100,000 per audit |
| 57.bb.  Each failure to substantially comply with the Comparative Monitoring requirements of Paragraph 44 | $50,000 per audit |
| 57.cc.  Each failure to timely submit a Corrective Action Plan that substantially conforms to the requirements of Paragraph 46 | Period of noncompliance   Penalty per day per violation<br><br>1-15 days                          $100<br>16-30 days                        $250<br>31 days or more                $500<br><br>Not to exceed $100,000 per audit |

43

| Violation | Stipulated Penalty |
|---|---|
| 57.dd.  Each failure to implement a corrective action within 90 days after the LDAR Audit Completion Date or pursuant to the schedule that Defendant must propose pursuant to Subparagraph 46.b if the corrective action cannot be completed in 90 days | Period of noncompliance   Penalty per day per violation<br><br>1-15 days                          $500<br>16-30 days                        $750<br>31 days or more                 $1,000<br><br>Not to exceed $200,000 per audit |
| 57.ee.  Each failure to timely submit a Certification of Compliance that substantially conforms to the requirements of Paragraph 47 | Period of noncompliance   Penalty per day per violation<br><br>1-15 days                          $100<br>16-30 days                        $250<br>31 days or more                 $500<br>Not to exceed $75,000 |
| 57.ff.  Each failure to substantially comply with any recordkeeping, submission, or reporting requirement in Subsection V.M not specifically identified above in this Table 2. | Period of noncompliance   Penalty per day per violation<br>1-15 days                          $100<br>16-30 days                        $250<br>31 days or more                 $500 |

58.    Stipulated Penalties in Lieu of those in Subparagraphs 57.p, 57.q, 57.r.

a.    For purposes of this Paragraph, the term "Non-Compliant Valve" means a valve that is either: (i) not a Low-E Valve; or (ii) not fitted with Low-E Packing.  The term "Compliant Valve" means a valve that is either: (i) a Low-E Valve; or (ii) fitted with Low-E Packing.

44

     b.     The stipulated penalties in Subparagraph 58.c are to be used instead of those in Subparagraphs 57.p, 57.q, or 57.r when a Non-Compliant Valve is installed instead of a Compliant Valve and all of the following requirements are met:

          i.     Defendant, and not a government agency, discovers the failure involved;

          ii.     Defendant promptly reports the failure to EPA;

          iii.     In the report, Defendant sets forth a schedule for promptly replacing the Non-Compliant Valve with a Compliant Valve; provided, however, that Defendant shall not be required to undertake an unscheduled shutdown of the affected Covered Process Unit in proposing the schedule unless Defendant so chooses;

          iv.     Defendant monitors the Non-Compliant Valve once a month from the time of its discovery until the valve is replaced with a Compliant Valve and no Screening Values above 100 ppm are recorded;

          v.     Defendant replaces the Non-Compliant Valve with a Compliant Valve in accordance with the schedule set forth in 58.b.iii; and

          vi.     Defendant demonstrates that in good faith it intended to install a Compliant Valve but inadvertently installed a Non-Compliant Valve.

     c.     The following stipulated penalties shall apply under the circumstances in Paragraph 58:

          i.     In lieu of the penalty in Subparagraph 57.p, $2,000 per failure.

          ii.     In lieu of the penalty in Subparagraph 57.q, $50 per day per failure, not to exceed $2,000.

          iii.     In lieu of the penalty in Subparagraph 57.r, $2,000 per failure.

59.  <u>Waiver of Payment</u>.  The United States may, in its unreviewable discretion, reduce or waive payment of stipulated penalties otherwise due to it under this Consent Decree.

60.  <u>Demand for Stipulated Penalties</u>.  A written demand for the payment of stipulated penalties will identify the particular violation(s) to which the stipulated penalty relates; the stipulated penalty amount (as can be best estimated) that the United States is demanding for each violation; the calculation method underlying the demand; and the grounds upon which the demand is based.  Prior to issuing a written demand for stipulated penalties, the United States may, in its unreviewable discretion, contact Merit for informal discussion of matters that the United States believes may merit stipulated penalties.

61.  <u>Stipulated Penalties' Accrual</u>.  Stipulated penalties will begin to accrue on the day after performance is due or the day a violation occurs, whichever is applicable, and will continue to accrue until performance is satisfactorily completed or the violation ceases.  Stipulated penalties shall accrue simultaneously for separate violations of this Consent Decree.

62.  <u>Stipulated Penalties Payment Due Date</u>.  Stipulated penalties shall be paid no later than 60 days after receipt of a written demand by the United States unless the demand is disputed through compliance with the requirements of the dispute resolution provisions of this Decree.

63.  <u>Manner of Payment of Stipulated Penalties</u>.  Stipulated penalties owing to the United States of under $10,000 will be paid by check and made payable to "U.S. Department of Justice," referencing DOJ Number 90-5-2-110951, and delivered to the U.S. Attorney's Office in the Western District of Michigan, 330 Ionia Ave. NW, Suite 501 Grand Rapids, MI 49503.  Stipulated

penalties owing to the United States of $10,000 or more will be paid in the manner set forth in Section IV (Civil Penalty) of this Consent Decree.  All transmittal correspondence shall state that the payment is for stipulated penalties, shall identify the violations to which the payment relates, and shall include the same identifying information required by Paragraph 10.

64.     <u>Disputes Over Stipulated Penalties</u>.  By no later than 60 days after receiving a demand for stipulated penalties, Merit may dispute liability for any or all stipulated penalties demanded by invoking the dispute resolution procedures of Section X.  If Merit fails to pay stipulated penalties when due and does not prevail in dispute resolution, Merit shall be liable for interest at the rate specified in 28 U.S.C. § 1961, accruing as of the date payment became due.

65.     No amount of the stipulated penalties paid by Merit shall be used to reduce its federal tax obligations.

66.     Subject to the provisions of Section XI of this Consent Decree (Effect of Settlement/Reservation of Rights), the stipulated penalties provided for in this Decree shall be in addition to any other rights, remedies, or sanctions available to the United States for a violation of this Consent Decree or applicable law.  In addition to injunctive relief or stipulated penalties, the United States may elect to seek mitigating emissions reductions equal to or greater than the excess amounts emitted if the violations result in excess emissions.  Merit reserves the right to challenge the United States' exercise of this option.  Where a violation of this Consent Decree is also a violation of the CAA or its implementing regulations, Merit shall be allowed a credit, for any stipulated penalties paid, against any statutory penalties imposed for such violation.

47

## VIII.  FORCE MAJEURE

67.    "Force Majeure," for purposes of this Consent Decree, is defined as any event beyond the control of Merit, its contractors, or any entity controlled by Merit that delays the performance of any obligation under this Consent Decree despite Merit's best efforts to fulfill the obligation.  The requirement that Merit exercise "best efforts to fulfill the obligation" includes using best efforts to anticipate any potential force majeure event and best efforts to address the effects of any such event: (a) as it is occurring; and (b) after it has occurred, to prevent or minimize any resulting delay.

68.    "Force Majeure" does not include Merit's financial inability to perform any obligation under this Consent Decree.  Unanticipated or increased costs or expenses associated with the performance of Merit's obligations under this Consent Decree shall not constitute circumstances beyond Merit's control nor serve as the basis for an extension of time under this Section VIII.

69.    If any event occurs which causes or may cause a delay or impediment to performance in complying with any provision of this Consent Decree, Merit shall notify EPA in writing promptly but not later than 14 business days after the time Merit first knew or should have known by the exercise of due diligence that the event might cause a delay.  In the written notice, Merit shall specifically reference this Paragraph 69 of the Consent Decree and shall provide, to the extent such information is available at the time, an explanation and description of the reasons for the delay; the anticipated duration of the delay; all actions taken or to be taken to prevent or minimize the delay; a schedule for implementation of any measures to be taken to prevent or

48

mitigate the delay or the effect of the delay; Merit's rationale for attributing such delay to a Force Majeure event; and a statement as to whether, in the opinion of the Merit, such event may cause or contribute to an endangerment to public health, welfare or the environment.  Merit shall be deemed to know of any circumstance of which Merit, any entity controlled by Merit, or Merit's contractors knew or should have known.  The written notice required by this Paragraph shall be effective upon the mailing of the same by overnight mail or by certified mail, return receipt requested, to EPA in the manner set forth in Section VI (Notices).

70.     Failure by Merit to materially comply with the notice requirements specified in Paragraph 69 shall preclude Merit from asserting any claim of Force Majeure with respect to the particular event involved, unless the United States, in its unreviewable discretion, permits Merit to assert a Force Majeure claim with respect to the particular event.

71.     The United States shall respond in writing to Merit regarding Merit's claim of Force Majeure within 45 days of receipt of the notice required under Paragraph 69.  After this initial response, the parties may confer.

72.     If EPA initially or ultimately agrees that the delay or anticipated delay is attributable to a Force Majeure event, the time for performance of the obligations under this Consent Decree that are affected by the Force Majeure event will be extended by EPA for such time as is necessary to complete those obligations.  An extension of the time for performance of the obligations affected by the Force Majeure event shall not, of itself, extend the time for performance of any other obligation.  However, Merit may request that the time be extended for performance of any other

49

obligation that is affected by the Force Majeure event.  EPA will notify Merit in writing of the length of the extension, if any, for performance of the obligations affected by the Force Majeure event.

73.     If EPA does not agree that the delay or anticipated delay has been or will be caused by a Force Majeure event, or if the parties fail to agree on the length of the delay attributable to the Force Majeure event, EPA will so notify Merit in writing of its final decision.

74.     If Merit elects to invoke the dispute resolution procedures set forth in Section IX (Dispute Resolution), it shall do so no later than 45 days after receipt of EPA's notice under Paragraph 71 (if the parties do not confer after that notice), or under Paragraph 73 (if the parties confer after the Paragraph 69 notice).   In any such proceeding, Merit shall have the burden of demonstrating by a preponderance of the evidence that the delay or anticipated delay has been or will be caused by a Force Majeure event, that the duration of the delay or the extension sought was or will be warranted under the circumstances, that best efforts were exercised to avoid and mitigate the effects of the delay, and that Merit materially complied with the requirements of Paragraphs 67 and 69.  If Merit carries this burden, the delay at issue shall be deemed not to be a violation by Merit of the affected obligation of this Consent Decree identified to EPA and the Court.

## IX.  DISPUTE RESOLUTION

75.     Unless otherwise expressly provided for in this Consent Decree, the dispute resolution procedures of this Section shall be the exclusive mechanism to resolve disputes arising under or with respect to this Consent Decree.

50

76.   <u>Informal Dispute Resolution</u>.  The first stage of dispute resolution shall consist of informal negotiations.  The dispute shall be considered to have arisen when one Party sends the other Party a written Notice of Dispute.  Such Notice of Dispute shall state clearly the matter in dispute.  The period of informal negotiations shall not exceed 30 days after the Notice of Dispute, unless that period is modified by written agreement.  If the Parties cannot resolve the dispute by informal negotiations, then the position advanced by the United States shall be considered binding unless within 45 days after the conclusion of the informal negotiation period, Merit invokes formal dispute resolution procedures set forth below.

77.   <u>Formal Dispute Resolution</u>.  Merit shall invoke formal dispute resolution procedures, within the time period provided in the preceding Paragraph, by serving on the United States a written Statement of Position regarding the matter in dispute.  The Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting Merit's position and any supporting documentation relied upon by Defendant.  Merit and the United States may hold additional discussions, which may, in the unreviewable discretion of each party, include higher-level representatives of any of the parties.

78.   The United States shall serve its Statement of Position within 45 days of receipt of Merit's Statement of Position.  The United States' Statement of Position shall include, but need not be limited to, any factual data, analysis, or opinion supporting that position and any supporting documentation relied upon by the United States.  The United States' Statement of Position shall be

51

binding on Merit unless Merit files a motion for judicial review of the dispute in accordance with the following Paragraph.

79.     Merit may seek judicial review of the dispute by filing with the Court and serving on the United States, in accordance with Section VI of this Consent Decree (Notices), a motion requesting judicial resolution of the dispute.  The motion must be filed within 60 days of receipt of the United States' Statement of Position pursuant to the preceding Paragraph.  The motion shall contain a written statement of Merit's position on the matter in dispute, including any supporting factual data, analysis, opinion, or documentation, and shall set forth the relief requested and any schedule within which the dispute must be resolved for orderly implementation of the Consent Decree.

80.     The United States shall respond to Merit's motion within the time period allowed by the Local Rules of this Court for responses to dispositive motions.  Merit may file a reply memorandum, to the extent permitted by the Local Rules.

81.     In a formal dispute resolution proceeding under this Section, Merit shall bear the burden of demonstrating that its position complies with this Consent Decree and the CAA and that they are entitled to relief under applicable principles of law.  The United States reserves the right to argue that its position is reviewable only on the administrative record and must be upheld unless arbitrary and capricious or otherwise not in accordance with law, and Merit reserves the right to argue to the contrary.

82.     The invocation of dispute resolution procedures under this Section shall not, by itself, extend, postpone, or affect in any way any obligation of Merit under this Consent Decree, unless and until final resolution of the dispute so provides.  Stipulated penalties with respect to the disputed matter shall continue to accrue from the first day of noncompliance, but payment shall be stayed pending resolution of the dispute.  If Merit does not prevail on the disputed issue, stipulated penalties shall be assessed and paid as provided in Section VIII (Stipulated Penalties).

## X.  INFORMATION COLLECTION AND RETENTION

83.     The United States and its representatives and employees shall have the right of entry into the Covered Facility, at all reasonable times, upon presentation of credentials and any other documentation required by law, to:

    a.    monitor the progress of activities required under this Consent Decree;

    b.    verify any data or information submitted to the United States in accordance with the terms of this Consent Decree;

    c.    obtain documentary evidence, including photographs and similar data, relevant to compliance with the terms of this Consent Decree; and

    d.    assess Merit's compliance with this Consent Decree.

84.     Until two years after termination of this Consent Decree, Merit shall retain, and shall instruct its contractors and agents to preserve, all documents, records, or other information, regardless of storage medium (*e.g.*, paper or electronic) in their or their contractors' or agents' possession or control, or that come into their or their contractors' or agents' possession or control, and that directly relate to Merit's performance of its obligations under this Consent Decree.  This

53

information-retention requirement shall apply regardless of any contrary corporate or institutional policies or procedures.  At any time during this information-retention period, the United States may request copies of any documents, records, or other information required to be maintained under this Paragraph.

85.    Except for emissions data, including Screening Values, Merit may also assert that information required to be provided under this Section is protected as Confidential Business Information ("CBI") under 40 C.F.R. Part 2.  As to any information that Merit seeks to protect as CBI, Merit shall follow the procedures set forth in 40 C.F.R. Part 2, where applicable.  Except for emissions data, including Screening Values, Merit reserves the right to assert any legal privilege and the United States reserves the right to challenge any claim of privilege.

86.    This Consent Decree in no way limits or affects any right of entry and inspection, or any right to obtain information, held by the United States pursuant to applicable federal laws, regulations, or permits, nor does it limit or affect any duty or obligation of Merit to maintain documents, records, or other information imposed by applicable federal or state laws, regulations, or permits.

## XI.  EFFECT OF SETTLEMENT/RESERVATION OF RIGHTS

87.    This Consent Decree resolves the civil claims of the United States for the violations alleged in the Complaint filed in this action and the Finding of Violation from the date those claims accrued through the Date of Lodging.

88.     The United States reserves all legal and equitable remedies available to enforce the provisions of this Consent Decree, except as expressly stated in Paragraph 87.  This Consent Decree shall not be construed to limit the rights of the United States to obtain penalties or injunctive relief under the CAA or implementing regulations, or under other federal laws, regulations, or permit conditions, except as expressly specified in Paragraph 87.  The United States further reserves all legal and equitable remedies to address any situation that may present an imminent and substantial endangerment to the public health or welfare or the environment arising at, or posed by, the Covered Facility, whether related to the violations addressed in this Consent Decree or otherwise.

89.     In any subsequent administrative or judicial proceeding initiated by the United States for injunctive relief, civil penalties, or other appropriate relief relating to the Covered Facility, Merit shall not assert, and may not maintain, any defense or claim based upon the principles of waiver, res judicata, collateral estoppel, issue preclusion, claim preclusion, claim-splitting, or other defenses based upon any contention that the claims raised by the United States in the subsequent proceeding were or should have been brought in the instant case, except with respect to claims that have been specifically resolved pursuant to Paragraph 87 of this Section.

90.     This Consent Decree is not a permit, or a modification of any permit, under any federal, state, or local laws or regulations.  Merit is responsible for achieving and maintaining compliance with all applicable federal, state, and local laws, regulations, and permits and Merit's compliance with this Consent Decree shall be no defense to any action commenced pursuant to any such laws, regulations, or permits.  The United States does not, by its consent to the entry of this

Consent Decree, warrant or aver in any manner that Merit's compliance with any aspect of this Consent Decree will result in compliance with provisions of the CAA, or with any other provisions of federal, state, or local laws, regulations, or permits.

91. This Consent Decree does not limit or affect the rights of Merit or of the United States against any third parties, not party to this Consent Decree, nor does it limit the rights of third parties not party to this Consent Decree, against Merit, except as otherwise provided by law.

92. This Consent Decree shall not be construed to create rights in, or grant any cause of action to, any third party that is not a Party to this Consent Decree.

## XII.  COSTS

93. The Parties shall bear their own costs of this action, including attorneys' fees, except that the United States shall be entitled to collect the costs (including attorneys' fees) against Merit incurred in any action necessary to enforce this Consent Decree or to collect any portion of the civil penalty or any stipulated penalties due but not paid by Merit.

## XIII.  EFFECTIVE DATE

94. The Effective Date of this Consent Decree shall be the date upon which this Consent Decree is entered by the Court or a motion to enter the Consent Decree is granted, whichever occurs first, as recorded on the Court's docket; provided, however, that Merit hereby agrees that it shall be bound upon the Date of Lodging to comply with obligations of Merit specified in this Consent Decree as accruing upon the Date of Lodging.  In the event the United States withdraws or withholds consent to this Consent Decree before entry, or the Court declines to enter the Consent

Decree, then the preceding requirement to comply with requirements of this Consent Decree upon the Date of Lodging shall terminate.

## XIV.  RETENTION OF JURISDICTION

95.     The Court shall retain jurisdiction over this case until termination of this Consent Decree for the purposes of resolving disputes arising under this Decree, entering orders modifying this Decree, or effectuating or enforcing compliance with the terms of this Decree.

## XV.  MODIFICATION

96.     The terms of this Consent Decree may be modified only by a subsequent written agreement signed by the United States and Merit.  Where the modification constitutes a material change to any term of this Consent Decree, it shall be effective only upon approval by the Court.

97.     Any disputes concerning modification of this Decree shall be resolved pursuant to Section IX of this Decree (Dispute Resolution); provided, however, that instead of the burden of proof as provided by Paragraph 81, the Party seeking the modification bears the burden of demonstrating that it is entitled to the requested modification in accordance with Federal Rule of Civil Procedure 60(b).

## XVI.  TERMINATION

98.     By no sooner than after completion of the third LDAR audit required pursuant to Subsection V.K of this Decree, Merit may send the United States a Request for Termination of this Consent Decree with respect to its Covered Facility.  In the Request for Termination, Merit must demonstrate that it has maintained satisfactory compliance with this Consent Decree for the two-

year period immediately preceding the Request for Termination.  In no event may this Consent Decree be terminated with respect to Merit if the civil penalty and/or any outstanding stipulated penalties have not been paid.  Any Request for Termination shall include all necessary supporting documentation.

99.     Following receipt by the United States of a Request for Termination, the Parties shall confer informally concerning the Request and any disagreement that the Parties may have as to whether the Merit has satisfactorily complied with the requirements for termination.  If the United States agrees that the Decree may be terminated with respect to the Defendant, the Parties shall submit, for the Court's approval, a joint stipulation terminating the Decree.

100.     If the United States does not agree that the Decree may be terminated, Merit may invoke dispute resolution under Section IX of this Decree.  However, Merit shall not invoke dispute resolution for any dispute regarding termination until 60 days after sending its Request for Termination.

## XVII.  PUBLIC PARTICIPATION

101.     This Consent Decree shall be lodged with the Court for a period of not less than 30 days for public notice and comment in accordance with 28 C.F.R. § 50.7.  The United States reserves the right to withdraw or withhold its consent if the comments regarding the Consent Decree disclose facts or considerations indicating that the Consent Decree is inappropriate, improper, or inadequate.  Merit consents to entry of this Consent Decree without further notice.

58

## XVIII.  SIGNATORIES/SERVICE

102.    The undersigned representatives of Merit and the Assistant Attorney General for the Environment and Natural Resources Division of the Department of Justice (or his or her designee) each certify that he or she is fully authorized to enter into the terms and conditions of this Consent Decree and to execute and legally bind the Party he or she represents to this document.

103.    This Consent Decree may be signed in counterparts, and its validity shall not be challenged on that basis.

104.    Merit agrees not to oppose entry of this Consent Decree by the Court or to challenge any provision of the Decree unless the United States has notified Merit in writing that it no longer supports entry of the Decree.

105.    Merit agrees to accept service of process by mail with respect to all matters arising under or relating to this Consent Decree and to waive the formal service requirements set forth in Rules 4 and 5 of the Federal Rules of Civil Procedure and any applicable Local Rules of this Court including, but not limited to, service of a summons.  Merit need not file an answer to the complaint in this action unless or until the Court expressly declines to enter this Consent Decree.

## XIX.  INTEGRATION

106.    This Consent Decree and its Appendix constitute the final, complete, and exclusive agreement and understanding between the Parties with respect to the settlement embodied in this Consent Decree and its Appendix, and supersede all prior agreements and understandings, whether oral or written, concerning the settlement embodied herein.  No other document, except for any

59

plans or other deliverables that are submitted and approved pursuant to this Decree, nor any representation, inducement, agreement, understanding, or promise, constitutes any part of this Decree or the settlement it represents, and no such extrinsic document or statement of any kind shall be used in construing the terms of this Decree.

## XX.  **FINAL JUDGMENT**

107.    Upon approval and entry of this Consent Decree by the Court, this Consent Decree shall constitute a final judgment of the Court in this action as to the United States and Merit.  The Court finds that there is no just reason for delay and therefore enters this judgment as a final judgment under FED. R. CIV. P. 54 and 58.

DATED this ___20th___ day of ____July____ 2015.


___/s/ Paul L. Maloney___
UNITED STATES DISTRICT JUDGE
WESTERN DISTRICT OF MICHIGAN

We hereby consent to the entry of the Consent Decree in the matter of <u>United States v. Merit</u> <u>Energy Company, LLC</u> , subject to public notice and comment.

FOR THE UNITED STATES OF AMERICA

THOMAS A. MARIANI, JR.
Deputy Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice

JEFFREY A. SPECTOR
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-4432
(202) 616-6584 (fax)

PATRICK A. MILES, JR.
United States Attorney

ADAM B. TOWNSHEND
Assistant U.S. Attorney
U.S. Attorney's Office, Western District of Michigan
330 Ionia Ave. NW, Suite 501
Grand Rapids, MI 49503
(616) 808-2130
(616) 456-2510 (fax)

61

We hereby consent to the entry of the Consent Decree in the matter of <u>United States v. Merit Energy Company, LLC</u>, subject to public notice and comment.

FOR THE UNITED STATES OF AMERICA


THOMAS A. MARIANI, JR.
Deputy Chief
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice


JEFFREY SPECTOR
Environmental Enforcement Section
Environment and Natural Resources Division
United States Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
(202) 514-4432
(202) 616-6584 (fax)

PATRICK A. MILES, JR.
United States Attorney

*Adam B. Townshend*

ADAM B. TOWNSHEND
Assistant U.S. Attorney
U.S. Attorney's Office, Western District of Michigan
330 Ionia Ave. NW, Suite 501
Grand Rapids, MI 49503
(616) 808-2130
(616) 456-2510 (fax)

We hereby consent to the entry of the Consent Decree in the matter of <u>United States v. Merit Energy Company, LLC</u>, subject to public notice and comment.

FOR THE UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

_for:_ BERTRAM C. FREY
Acting Regional Counsel
U.S. Environmental Protection Agency
Region 5
Chicago, IL

SUSAN HEDMAN
Regional Administrator
U.S. Environmental Protection Agency
Region 5
Chicago, IL

DEBORAH A. CARLSON
Associate Regional Counsel
U.S. Environmental Protection Agency
Region 5
Chicago, IL

62

We hereby consent to the entry of the Consent Decree in the matter of <u>United States v. Merit Energy Company, LLC</u>.

FOR MERIT ENERGY COMPANY, LLC

CHRISTOPHER S. HAGGE
General Counsel
Merit Energy Company, LLC

63

# APPENDIX A

## APPENDIX A

### Factors to be Considered and Procedures to be Followed
### To Claim Commercial Unavailability

This Appendix outlines the factors to be taken into consideration and the procedures to be followed for Merit to assert that a Low-E Valve or Low-E Packing is "commercially unavailable" pursuant to Paragraph 33 of the Consent Decree.

## I.   FACTORS

A.   Nothing in this Consent Decree or this Appendix requires Merit to utilize any valve or packing that is not suitable for its intended use in a Covered Process Unit.

B.   The following factors are relevant in determining whether a Low-E Valve or Low-E Packing is commercially available to replace or repack an existing valve:

1.   Valve type (*e.g.,* ball, gate, butterfly, needle) (this ELP does not require consideration of a different type of valve than the type that is being replaced);
2.   Nominal valve size (*e.g.,* 2 inches, 4 inches);
3.   Compatibility of materials of construction with process chemistry and product quality requirements;
4.   Valve operating conditions (*e.g.,* temperature, pressure);
5.   Service life;
6.   Packing friction (*e.g.,* impact on operability of valve);
7.   Whether the valve is part of a packaged system or not;
8.   Retrofit requirements (*e.g.,* re-piping or space limitations);
9.   Other relevant considerations

C.   The following factors may also be relevant, depending upon the process unit or equipment where the valve is located:

10.   In cases where the valve is a component of equipment that Merit is licensing or leasing from a third party, valve or valve packing specifications identified by the lessor or licensor of the equipment of which the valve is a component
11.   Valve or valve packing vendor or manufacturer recommendations for the relevant process unit components.

1

## II.    PROCEDURES THAT MERIT SHALL FOLLOW TO ASSERT COMMERCIAL UNAVAILABILITY

A.    Merit shall comply with the following procedures if it seeks to assert commercial unavailability under Paragraph 33 of the Consent Decree:

1.    Merit must contact a reasonable number of vendors of valves or valve packing that Merit, in good faith, believes may have valves or valve packing suitable for the intended use taking into account the relevant factors listed in Section I above.

a.    For purposes of this Consent Decree, a reasonable number of vendors presumptively shall mean no less than three.

b.    If fewer than three vendors are contacted, the determination of whether such fewer number is reasonable shall be based on Factors (10) and (11) or on a demonstration that fewer than three vendors offer valves or valve packing considering Factors (1) – (9).

2.    Merit shall obtain a written representation from each vendor, or equivalent documentation, that a particular valve or valve packing is not available as "Low-Emissions" from that vendor for the intended conditions or use.

a.    "Equivalent documentation" may include e-mail or other correspondence or data showing that a valve or valve packing suitable for the intended use does not meet the definition of "Low-E Valve" or "Low-E Packing" in the Consent Decree or that the valve or packing is not suitable for the intended use.

b.    If the vendor does not respond or refuses to provide documentation, "equivalent documentation" may consist of records of Merit's attempts to obtain a response from the vendor.

3.    Each Compliance Status Report required by Section V of the Consent Decree shall identify each valve that Merit otherwise was required to replace or repack, but for which, during the time period covered by the Report, Merit determined that a Low-E Valve and/or Low-E Packing was not commercially-available.  Merit shall provide a complete explanation of the basis for its claim of commercial unavailability, including, as an attachment to the Compliance Status Report, all relevant documentation.  This report shall be valid for a period of twelve months from the date of the report for the specific valve involved and all other similar valves, taking into account the factors listed in Part I.

**III.    OPTIONAL EPA REVIEW OF DEFENDANT'S ASSERTION OF COMMERCIAL UNAVAILABILITY**

A.    At its option, EPA may review an assertion by Merit of commercial unavailability. If EPA disagrees with Merit's assertion, EPA shall notify Merit in writing, specifying the Low-E Valve or Low-E Packing that EPA believes to be commercially available and the basis for its view that such valve or packing is appropriate taking into consideration the Factors described in Part I. After Merit receives EPA's notice, the following shall apply:

1.    Merit shall not be required to retrofit the valve or valve packing for which it asserted commercial unavailability (unless Merit is otherwise required to do so pursuant to another provision of the Consent Decree).

2.    Merit shall be on notice that EPA will not accept a future assertion of commercial unavailability for:  (i) the valve or packing that was the subject of the unavailability assertion; and/or (ii) a valve or packing that is similar to the subject assertion, taking into account the Factors described in Part I.

3.    If Merit disagrees with EPA's notification, Merit and EPA shall informally discuss the basis for the claim of commercial unavailability.   EPA may thereafter revise its determination, if necessary.

4.    If Merit makes a subsequent commercial unavailability claim for the same or similar valve or packing that EPA previously rejected, and the subsequent claim also is rejected by EPA, Merit shall retrofit the valve or packing with the commercially available valve or packing unless Merit is successful under Subsection III.B below.

B.    Any disputes under this Appendix first shall be subject to informal discussions between Merit and EPA for a period not to exceed 30 days before Merit shall be required to invoke the Dispute Resolution provisions of Section IX of the Consent Decree.  Thereafter, if the dispute remains, Merit shall invoke the Dispute Resolution provisions.